UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ALFREDO VILLOLDO, individually, and GUSTAVO VILLOLDO, individually, and as executor, administrator, and personal representative of the ESTATE OF GUSTAVO VILLOLDO ARGILAGOS, et al., <br><br>                  Plaintiff(s), <br><br> v. <br><br> FIDEL CASTRO RUZ, an individual and as an official, employee, or agent of the Republic of Cuba, RAUL CASTRO RUZ, as individual, and as official employee, or agent of the Republic of Cuba, THE MINISTRY OF INTERIOR, an agency and instrumentality of the Republic of Cuba, THE ARMY OF THE REPUBLIC OF CUBA, an instrumentality of the Republic of Cuba, and THE REPUBLIC OF CUBA, a foreign State, <br><br>                  Defendant(s). | Misc. No. 13-mc-0222 (DRD) |

**OPINION AND ORDER**

Pending before the Court are several motions filed by plaintiffs, Alfredo Villoldo and his brother Gustavo Villoldo, who is also the executor, administrator and personal representative of the Estate of Gustavo Villoldo Argilagos.[1] The Villoldo brothers were born in the United States of America,[2] they are United States citizens, and have resided in the United States since 1960. *Id.*

---

[1]     The Villoldo brothers allege that their father, the late Gustavo Villoldo Argilagos, who was born in Cuba, on December 25, 1901, was also a dual citizen of both the United States and Cuba, as his mother, Marie Villoldo Argilagos, was a United States citizen who was born and raised in New York City. *See* Docket No. 2-2, page 2. The parents of the late Gustavo Villoldo Argilagos were married in New York on or about 1897. *Id.*

[2]     Gustavo Villoldo was born on January 21, 1926, and Alfredo Villoldo was born on June 6, 1937. *See* Docket No. 2-2, page 2.

Alfredo and Gustavo Villoldo (hereinafter the "Villoldo brothers") are sons of the deceased Gustavo Villoldo Argilagos, who passed away in Cuba on or about February 16, 1959, after the existing government regime had threatened to kill their entire family unless their father, Mr. Villoldo Argilagos committed suicide and turn all of his assets to the Cuban government. After Mr. Villoldo Argilagos was found dead from an apparent suicide, it appears that the Cuban government confiscated the assets owned by Mr. Villoldo Argilagos, which includes, to wit, his land and bank accounts.

The Villoldo brothers flew to the United States over forty years ago, and filed an action in the State of Florida against The Republic of Cuba, and several Cuban government officials. On August 22, 2011, the Villoldos secured a *Final Judgment* in the amount of $2.79 billion (hereinafter the "*Judgment*"), in the State Court of Florida, Civil Case No. 08-14505 CA 25, and proceeded to register said *Judgment* in the United States District Court for the Southern District of New York, the United States District Court for the District of Massachusetts, and the United District Court for the District of Puerto Rico.[3]

In sum, the Villoldos decided to satisfy the money *Judgment* issued by the State of Florida by registering the *Judgment* in the districts wherein Cuban nationals had assets, such as bank accounts, shares, others, from which the Villoldos may simply collect the *Judgment* money. The Villoldos requested attachment and execution of said assets, on the grounds that the assets located in New York, Massachusetts, and Puerto Rico, are property of The Republic of Cuba, as opposed

---

[3]        The case filed in the State of New York herein referred to, was filed on December 21, 2011 under Case No. 11-09394, and closed on October 23, 2012. The case filed in the State of Massachusetts herein referred to, was filed on May 13, 2013, under Case No. 13-mc-94014. The instant case was filed in Puerto Rico on May 21, 2013, under Case No. 13-mc-222.

to the individual Cuban nationals who may appear as the owners of said accounts.

As stated above, the Villoldo brothers proceeded to register the Florida *Judgment* with the United States District Court for the Southern District of New York under Case No. 11-cv-09394, together with an *Amended Default Judgment* of October 25, 2012 issued by the Court . The record shows, however, that the Villoldo brothers have been unable to execute their entire multi-billion dollar registered *Judgment* in Case No. 11-09394.[4] Nonetheless, the Court docket of Case No. 11-09394 shows that, as of this date, the case is active, and the Villoldo brothers are leaving no stones unturned in their pursuit of attempting to execute the registered *Amended Default Judgment* registered in Case No. 11-09394.

The Villoldo brothers registered the same *Amended Default Judgment* with this Court, on May 21, 2013, under Case No. 13-mc-222 (DRD).

**Issue**

The issue before the Court is whether the accounts being pursued by plaintiffs are the property of Cuba.[5]

**Procedural Background**

On November 21, 2014, Banco Popular de Puerto Rico's ("Banco Popular") filed a *Motion to Quash Subpoena* served by plaintiffs requesting the production of documents and/or information

---

[4] The Court notes that several proceedings have been filed by the Villoldo brothers in the federal courts in the United States. *See Plaintiffs' Response to Order to Show Cause (D.E.)*, Docket No. 52, pages 2-3. A Westlaw research shows that the Villoldo brothers have more than 40 actions filed in federal courts, as of June 21, 2017. **This Court, however, will follow the ruling of the United States Court of Appeals for the First Circuit, in *Villoldo v. Castro Ruz*, 821 F.3d 196, 201-204 (1st Cir.2016)**, *see* discussion *infra*.

[5] The issue in the instant case is exactly the same issue presented in the case of *Villoldo v. Castro Ruz*, 821 F.3d 196. As a matter of fact, the Court finds that the instant case is a "mirror" case of the First Circuit case, *Villoldo v. Castor Ruz*, *supra*.

on the grounds relating to the execution of the *Final Judgment* entered by the Circuit Court of the Eleventh Judicial Circuit In and For Miami-Dade County, Florida, on August 22, 2011, in Case No. 08-14505 CA 25, and the *Amended Default Judgment* entered in Case No. 11-09394 (LTW), in the United States District Court for the Southern District of New York.  *See* Case No. 13-mc-222, Docket entry No. 1-1, pages 2-12.   Plaintiffs' *Subpoena* served upon Banco Popular, specifically requested the production of the following information:

1.      The most recent annual report provided by Banco Popular de Puerto Rico to the Office of Foreign Assets control of the U.S. Department of the Treasury, regarding assets within its possession that have been blocked/frozen, pursuant to the Cuban Assets Control Regulations, 31 C.F.R. part 515, and all books, papers or records in your possession or control, which may contain information concerning the property or income of, or indebtness due judgment debtor.

2.      All records, documents, and writings of any kind in your possession, custody, or control, relating to all accounts identified in response to Request No. 1, including but not limited to wire transfer information, deposit account information, checking accounts, savings accounts, certificates of deposit, brokerage or trading accounts, and safe deposit boxes.

*See* Case No. 13-mc-222, Docket entry No. 5.

On September 17, 2015, the Court held a hearing on Banco Popular's *Motion to Quash Subpoena*, and plaintiffs' opposition thereto.  After considering the arguments of the parties, the Court then denied Banco Popular's motion to quash, and ordered Banco Popular to provide the

information requested to be filed in a restrictive fashion and accessible to selected parties only. *See* Case No. 13-mc-222, Minutes for the Hearing held on September 17, 2015, Docket entry No. 21, and the Transcript of the Proceedings held on September 17, 2015, Docket entry No. 32.

On January 13, 2017, the Court entered an *Order* at Docket No. 51, wherein the Court granted the parties 14 days to show cause why the Court should not dismiss the instant action with prejudice based on federal circuit court opinions cited therein. Plaintiffs vehemently opposed to the dismissal of the instant case, and cited all the federal district courts wherein the Villoldo brothers have registered their Florida state court *Judgment*, and have received full faith and credit for said *Judgment*. "While not every effort has born fruit, the Plaintiff have recovered in excess of $10,000,000.00 on their judgment through orders of federal district courts directing turnover of blocked Cuban assets." *See* Docket entry No. 52. Plaintiffs reiterates their right to the information requested from Banco Popular, as they are not requesting the turnover of property that Banco Popular may be holding under the Cuban Assets Control Regulations, 31 C.F.R. Part 515. *Id.*

Plaintiffs further moved the Court to schedule a status conference and to issue an order of execution and writ of garnishment. Banco Popular opposed all the Plaintiffs' requests. *See* Docket entries No. 57, 58, 59 and 60. Our analysis follows.

### Discussion

A.  The Foreign Sovereign Immunity Act of 1976, 28 U.S.C. § 1604 and the Terrorism Risk Insurance Act ("TRIA"), 28 U.S.C. § 1610.

Section 1604 provides in its relevant part:

> Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607

5

of this chapter.

As stated above, the core of the issue in the instant case is "whether the accounts being pursued by the Villoldo brothers for attachment and execution are the property of Cuba." *Villoldo v. Castro Ruz*, 821 F.3d 196, 201-202 (1ˢᵗ Cir.2016). Based upon the factual similarities between the First Circuit case and the instant case, the Court closely discuss and follows the First Circuit decision.

The First Circuit analysis follows:

Under the mandate of the First Circuit, any monies or assets under the custody of Banco Popular in Puerto Rico, which are under the name of Fidel Castro Ruz; Raul Castro Ruz; The Republic of Cuba; The Ministry of Interior, an agency or instrumentality of The Republic of Cuba; The Army of the Republic of Cuba, an agency or instrumentality of The Republic of Cuba, and The Republic of Cuba, a foreign state, are attachable as they are identical to the defendants in State of Florida Case No. 08-14505 CA 25, wherein a judgment for execution of over $2 Billion dollars was rendered against said parties.

> There is no dispute that if the accounts subject to the initial turnover order are the property of Cuba, then they are subject to attachment, even though the Foreign Sovereign Immunity Act generally immunizes "foreign state[s]" in United States courts, 28 U.S.C. § 1604, and protects the property of foreign states from attachment and execution. *Id*. § 1609. The reason is that an exception to the general rule regarding foreign sovereign immunity applies to cases related to terrorism, *see id.* §§ 1605A; 1610(a)(7); *see also* Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322, 2337 (codified in relevant part at 28 U.S.C. § 1610 note), and there is no dispute that this exception would apply here.

821 F.3d at 201.

It is also certain that some assets may not be attached due to the "extraterritorial exception."

**Thus, the key question for us is whether the accounts are the property of Cuba**. The answer depends on foreign relations law, and, in particular, the scope of what is known as the "act of state" doctrine. Under that doctrine, "the act within its own boundaries of one sovereign State becomes a rule of decision for the courts of this country." *W.S. Kirkpatrick & Co., Inc. v. Envir Tectonics Corp., Int'l.*, 493 U.S. 400, 406 (1990) (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918) (ellipses omitted); *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964). (Emphasis ours).

**There is, however, "a well established corollary to the act of state doctrine, the so-called 'extraterritorial exception**.'" *Tchacosh Co., Ltd. v. Rockwell Int'l Corp.*, 766 F.2d 1333, 1336 (9ᵗʰ Cir.1985). Under that exception, "when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States.'" *Republic of Irak v. First National City Bank*, 353 F.2d 47, 51 (2d Cir.1965) (Friendly, J.). (Emphasis ours).

821 F.3d at 201-202.

On this matter, the Court has reviewed several other opinions issued by the Supreme Court of the United States, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964); United States Court of Appeals for the Second Circuit, *Villoldo v. BNP Paribas S.A.*, 648 Fed.Appx. 53 (2d Cir.2016)(April 29, 2016); *Aldo Vera, Jr., as Personal Representative of the Estate of Aldo Vera, Sr.; Jeannette Fuller Hausler, as successor Personal Representative of the Estate of Robert Otis Fuller; Gustavo Villoldo; Alfredo Villoldo, individually and as Administrator, Executor, and Personal Representative of the Estate of Gustavo Villoldo; Alfredo Villoldo v. The Republic of Cuba, and Banco Bilbao Vizcaya Argentaria, S.A.*, 651 Fed. Appx. 22 (2d Cir.June 3, 2016), *cert. denied*, ____ U.S. ____ (February 21, 2017), 137 S.Ct. 1064, 197 L.Ed.2d 175 (2017), as well as the opinion issued by the First Circuit, *Alfredo Villoldo, individually; Gustavo E. Villoldo, individually, and as Administrator, Executor and Personal Representative of the Estate of Gustavo Villoldo Argilagos*

7

*v. Castro Ruz, as an individual, and as an official, employee, or agent of The Republic of Cuba, et al., Computershare, Inc., Trustee*, 821 F.3d 196 (1ˢᵗ Cir.2016).

On July 6, 1960, the Congress of the United States amended the Sugar Act of the 1948, "to permit a presidentially directed reduction of the sugar quota for Cuba." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 400-401 (1964). On the same date of the Congressional enactment, "the Cuban Council of Ministers adopted 'Law No. 851,' which characterized this reduction in the Cuban sugar quota as an act of 'aggression, for political purposes' on the part of the United States, justifying the taking of countermeasures by Cuba." *Id.* "The law gave the Cuban President and Primer Minister discretionary power to nationalize by forced expropriation property or enterprises in which American nationals had an interest." *Id.*

In *Banco Nacional de Cuba*, 376 U.S. at 401, an American commodity broker purchased the Cuban sugar, "free alongside the steamer, from a wholly owned subsidiary of Compania Azucarera Vertientes-Camaguey de Cuba (C.A.V.), a corporation organized under Cuban law whose capital stock was owned principally by United States residents." 376 U.S. at 401. After the enactment of Law No. 851 by The Republic of Cuba, the law provided for the "compulsory expropriation of all property and enterprises, and of rights and interests arising therefrom, of certain listed companies, including C.A.V., wholly or principally owned by American nationals." 376 U.S. at 403. In sum, due to the Cuban appropriation Law No. 851, Banco Nacional de Cuba became the owner of the sugar that once belonged to a Cuban corporation whose stock was principally owned by residents of the United States. A counterclaim was filed to question the validity of such appropriation. The Supreme Court of the United States held that the invalidity of said appropriation cannot be sustained in an action brought by an instrumentality of The Republic of Cuba.

The question which brought this case here, and is now found to be the dispositive issue, is whether the so-called act of state doctrine serves to sustain petitioner's claims in this litigation. Such claims are ultimately founded on a decree of the Government of Cuba expropriating certain property, the right to the proceeds of which is here in controversy. **The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized sovereign power committed within its own territory**. (Emphasis ours).

376 U.S. at 400-401.

Based on the above stated premises, the Court revisits the opinion of *Villoldo v. Castro Ruz*, 821 F.3d 196, 201-204 (1st Cir.2016) (Barron, J.)(citing the collection of cases referred therein), wherein the Court dismissed the Villoldos' appeal on May 12, 2016, on the grounds that (a) the United States will provide full faith and credit to "accounts subject to the initial turnover order [that] are property of Cuba," as they are subject to attachment; (b) the "United States courts will not give extraterritorial effect to a foreign state's confiscatory law;" and (c) the accounts subject to the turnover order were not property of Cuba. This district court waited patiently for a potential appeal of the Villoldo case to the United States Supreme Court. No appeal was filed.

The Villoldos argued that the "accounts [in question] were opened by individual Cuban nationals — by reason of a confiscatory law that Cuba enacted in September of 1959, Law 568." *Villoldo*, 821 F.3d at 202-204. The Court held:

> Normally, "our courts will not give extraterritorial effect to a confiscatory decree of a foreign state, even where directed against its own nationals." *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1025 (5th Cir.1972) (internal quotation marks omitted, collecting cases). After all, United States law and policy - as evidenced by the Fifth Amendment of the United States Constitution - does not support the taking of private property without just compensation. *See e.g., Republic of Irak v. First National City Bank*, 353 F.2d 47, 51-52 (2d Cir.1965) (Friendly, J.).

. . .

The [Villoldo] brothers do contend that TRIA [Terrorism Risk Insurance Act of 2002] [Pub. L. No. 107-297, 116 Stat. 2322, 2337 (codified in relevant part at 28 U.S.C. § 1610 note)] - in making an exception to foreign sovereign immunity - embodies a policy in favor of allowing victims of terrorism to collect on judgments. But TRIA only tells us that the property that is owned by a foreign state should be used to pay such judgments. *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 938-39 (D.C.Cir.2013). Nothing in the text or legislative history of TRIA suggests that the extraterritorial exception to the act of state doctrine should be disregarded so that certain assets become the property of the foreign country. [*Fn.*3] *See id.*

> *Fn.*3: The [Villoldo] brothers' reliance on the Supreme Court's decision in *Bank Markazi v. Peterson*, ___ U.S. ___, 136 S.Ct. 1310, 194 L.Ed.2d 463 (2016), is misplaced. In that case, the Court upheld a statute, 22 U.S.C. § 8772, which Congress passed in order to make certain specific assets subject to attachment in order to satisfy terrorism related judgments against Iran, regardless of whether those same assets would have been attachable under TRIA. *Id.* at 1317. But neither the act of state doctrine, nor the extraterritorial exception to it, were at issue in that case, and nothing about the Court's decision upholding Congress's authority to make those assets attachable remotely suggests that TRIA itself reflects Congress's intent that an exception to the extraterritorial exception to the act of state doctrine should be created. If anything, the fact that Congress specifically intervened to make certain that the assets at issue in *Bank Markazi* could be attached cautions against reading TRIA itself to manifest a similarly specific intention regarding the assets at issue in this case.

**We thus decline to deviate in this case from the general rule that United States courts will not give extraterritorial effect to a foreign state's confiscatory law**. *See Williams Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 75 (D.C.Cir.1988); *United Bank Ltd. v. Cosmic Int'l, Inc.*, 542 F.2d 868, 872-877 (2d Cir.1976);; *Menendez v. Saks & Co.*, 485 F.2d 1355, 1364

(2d Cir.1973), *rev'd on other grounds, Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976); *Maltina*, 462 F.2d at 1027; *Republic of Irak*, 353 F.2d at 51-52; *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706, 716 (5th Cir.1968). **We therefore affirm the District Court's ruling and dismissal of the case.** (Emphasis ours).

The Court, however, finds critical the underlying facts that triggered the thorough opinion issued by the district court in *Villoldo v. Castro Ruz*, 113 F.Supp.3d 435 (D.Mass.2015) (Hillman, J.), which gave path to the First Circuit opinion, *Villoldo v. Castro Ruz*, 821 F.3d 196 (1st Cir.2016) (Barron, J.).

The factual situation in *Villoldo v. Castro Ruz* [First Circuit] is almost identical to the underlying facts in the instant case, that is, the Villoldo's request for the execution of a default judgment awarded by the State of Florida against the defendants, Fidel Castro Ruz, Raul Castro Ruz, the Ministry of the Interior, the Army of the Republic of Cuba, and the Republic of Cuba, for the wrongful death of Gustavo Villoldos Argilagos, father of the Villoldo brothers.

The district court of Massachusetts originally granted plaintiffs' *ex parte* motion for turnover on December 11, 2013, under the premise that "under Cuban Law Nos. 567 and 568, the Computershare accounts are owned by the Republic of Cuba, and are therefore subject to attachment and execution to satisfy Plaintiffs' judgment under the Terrorism Risk Insurance Act of 2002 and the Foreign Sovereign Immunities Act." 113 F.Supp.3d at 437. After summons were originally served upon Computershare by the trustee, Computershare did "not oppose the turnover of the accounts within its possession." *Id.* However, on April 2, 2014, Computershare "had a change of heart and filed an emergency motion for a continuance of the turnover process, citing 'the myriad of regulatory, contractual, and statutory securities issues' raised by the Turnover Order." *Id.*

"Subsequently, the United States filed a statement of interest urging the Court rescind the Turnover Order." 113 F.Supp.3d at 437. The United States moved the Court to "reconsider its conclusion that the accounts are owned by Cuba." *Id.* After the parties were granted time to brief the Court on "whether Cuban Law Nos. 567 and 568 vested ownership of the Computershare accounts in Cuba," the district court vacated the Turnover Order, and denied plaintiffs' motions for the Turnover of Book Shares and Cash Accounts, plaintiffs' motion to compel the re-issuance of Certified Shares, and the motion to complete turnover and set bond for the re-issuance of certified shares. 113 F.Supp.3d at 437.

The district court based its ruling on several considerations. The Foreign Sovereign Immunities Act (FSIA) provides that "a foreign state will be 'immune from the jurisdiction of the courts of the United States and of the States.'" *Hausler v. JP Morgan Chase Bank, N.A.*, 770 F.3d 207, 211 (2d Cir.2014) (citing 28 U.S.C. § 1604 (1988))." 113 F.Supp.3d at 437, 438. "One of those exceptions is § 201 if the Terrorism Risk Insurance Act (TRIA), which makes liable terrorist states for judgments obtained against them in U.S. courts." *Id.* Section 201(a) provides:

> Notwithstanding any other provision of law . . . ., in every case in which a person has obtained a judgment against a terrorist party against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under [28 U.S.C. § 1605A] . . ., *the blocked assets of that terrorist party* (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.
>
> . . .
>
> The issue before this Court is whether the Computershare accounts are owned by the Republic of Cuba. If so, TRIA § 201(a) allows Plaintiffs to attach the accounts in satisfaction of their Florida state

court judgment. [*N.*2]⁶  Plaintiffs argue that the accounts, which are held in the names of seventy account holders believed to be Cuban nationals, are the property of Cuba.  According to Plaintiffs, Cuban Law Nos. 567 and 568 made it illegal for Cuban nationals to hold investments in foreign companies and any such assets were automatically nationalized pursuant to those laws in the early to mid-1960s.  **Therefore, Plaintiffs' claim that the Computershare accounts are owned by Cuba.  Computershare and the United States raise three impediments to this theory of recovery.  First, they argue that Cuban Law Nos. 567 and 568 cannot be given extraterritorial effect by this Court.  Second, they contend that the penal law rule precludes application of the Cuban laws.  Third, Computershare and the United States assert that, by their plain language, the Cuban laws did not nationalize the Computershare accounts.**  (Emphasis ours).

The Court further held, 113 F.Supp.3d at 439, 440:

> However, the act of state doctrine only forbids judicial examination of "taking[s] by a foreign sovereign of property *within its own territory*," and does not bar inquiry into the expropriation of property located outside the foreign state; . . . *see also Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903, 908 (2d Cir.1981). [Emphasis on the original].   . . .  U.S. courts generally "will not give extra-territorial effect to a confiscatory decree of a foreign state, even where directed against its own nationals." *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021, 1025 (5ᵗʰ Cir.1972).  This is true regardless of whether the foreign state attempts to expropriate property of individuals or a domestic corporation.  *See Republic of Irak v. First National City Bank*, 353 F.2d at 51.  **The prevailing rule is that when a property is located in the United States at the time of the foreign state's attempted confiscation, U.S. courts will recognize the foreign decree only if it would be "consistent with the policy and law of the United States."**  *Id*. (Quoting Restatement of Foreign Relations Law of the United States § 46): *see also*

---

⁶       *N.*2: As explained in the Court's order of January 8, 2015, the Computershare accounts are "blocked assets" and Cuba is a "terrorist party" within the meaning of the statute, because the accounts have been frozen by the Department of the Treasury's Office of Foreign Assets Control (OFAC), and **Cuba has been designated as a state sponsor of terror since 1982.  The President's announcement on April 14, 2015 that Cuba would be removed from the list of state sponsors of terror has no effect on this proceeding because Cuba was designated as a state sponsor of terror at the time the terrorist acts occurred**.  *See Kilburn v. Republic of Iran*, 441 F.Supp.2d 74, 77-78 (D.D.C.2006); *see also* Florida State Court Final Judgment, Docket No. 9, Ex. A (describing acts of terror committed by Castro regime against Plaintiffs).  (Emphasis ours).

*Chemical Bank*, 658 F.2d at 908-09 (discussing *United States v. Belmont*, 301 U.S. 324 (1937)). (Emphasis ours).

Plaintiffs contend that the extraterritorial effect rule does not apply because Cuban Law Nos. 567 and 568 caused assets of Cuban nationals to be "forfeited" to the Cuban government rather than "confiscated" or "expropriated." Plaintiffs cite no authority for this semantic distinction and the Court rejects it. The interpretation of the Cuban laws advanced by Plaintiffs could eliminate the rights of the Cuban nationals to the Computershare account and vest ownership in the Republic of Cuba. . . . **The question for the Court, then, is whether it would be consistent with United States policy and law to recognize the validity of Cuban Law Nos. 567 and 568. Clearly, it would not.** (Emphasis ours).

. . . [In *Chemical Bank*, 658 F.2d 903, 909] The district judge ruled that Banco Nacional was unable to assert the claims as successor because the assets were located in the United States and the foreign appropriation could not be given extraterritorial effect. *Id.* at 907.

The Second Circuit reversed.

The district Court in *Villoldo v. Castro Ruz*, 113 F.Supp.3d at 441-443, *affirmed* by the First Circuit, *Villoldo v. Castro Ruz*, 821 F.3d 196, also disagreed with *Chemical Bank*. 113 F.Supp.2d at 441.

First, enforcement of the Cuban laws will not further the policy aims of TRIA. One of the principal goals of TRIA § 201(a) is to compensate victims of state-sponsored terrorism. *See Haiser v. Islamic Republic of Iran*, 735 F.3d 934, 938-39 (D.C. Cir.2013) (discussing legislative history of TRIA § 201). To be sure, ordering turnover of Computershare accounts would compensate the Villoldo family and provide some measure of restitution for the terrorist acts committed against them by the Castro regime. That is not the end of the story, though, because

TRIA is also intended to punish and deter terrorist states by making them liable for judgments obtained against them in our courts. *Id.* at 939-40; *see also* 148 Cong. Rec. 23, 121 (Statement of Sen. Harkin) (noting that TRIA § 201 would "punish and impose a heavy cost" on state sponsors of terror and "deter future acts of

14

terrorism"). **The statute achieves this goal by ensuring that victims can only collect frozen assets that belong to state sponsors of terror.** *See* TRIA § 201(a) (making attachable the "blocked assets *of* that terrorist party) (emphasis added); *see also Heiser*, 735 F.3d at 939-40 (observing that **Congress did not intend victims to be paid with assets <u>not</u> owned by a terrorist state**). (Emphasis ours).

**Therefore, for the Court to give effect to Cuban Law Nos. 567 and 568, enforcement of the expropriation must further the policy of compensating victims with assets owned by Cuba. But the Computershare accounts are only owned by Cuba if the Court gives effect to Cuban Law Nos. 567 and 568. The Court refuses to adopt such a circular justification, because it would allow Cuba to escape TRIA's sanctions at the expense of the Cuban nationals who originally owned the accounts. This is precisely the concern that the D.C. Circuit found compelling in *Heiser v. Islamic Republic of Iran*, where the court determined that certain blocked assets with ties to Iran were not attachable under TRIA § 201(a). [*N*.8][7] 735 F.3d 934 (D.C.Cir.2013)**. In reaching that conclusion, the court discussed the "acute" need to preserve the punitive effect of the law by ensuring that attachable assets are owner of $38,000 worth of shares and dividends that Plaintiffs seek to attach. (Emphasis ours).

Indeed, the United States has itself filed a statement of interest in this case, asserting that enforcement of the Cuban laws would be inconsistent with national policy interest. . . . **The government states that recognition of Cuba's attempt to confiscate the assets of its citizens would undermine the punitive effect of TRIA and weaken the leverage of blocked assets as a tool of foreign policy**. (Emphasis ours). . . . **These concerns are heightened where, as here, one set of the Castro regime's victims would bear the cost of the regime's terrorist acts by paying Cuba's debt to other victims.** *Id.* **The Court gives significant weight to the government's representations of its own policy**

---

[7] *N*.8: The frozen assets at issue in *Heiser* were electronic funds transfers blocked by OFAC because the beneficiaries of the transfers used Iranian banks. 735 F.3d at 935–36. Thus, Iranian entities did not own the assets, but had a contingent future possessory interest in them. Id. at 936–37.

interests—especially in the context of foreign affairs. [*N*.9][8] **Accordingly, the Court finds that the policy aims of TRIA will not be furthered by enforcement of the Cuban laws.** (Emphasis ours).

Second, substantial Fifth Amendment concerns are present in this case. In *Chemical Bank*, the Second Circuit was not concerned with the property rights of the original bank owners because in the twenty years in which the litigation had been pending, none had asserted a conflicting claim. 658 F.2d at 909. The potential claims of the Cuban nationals cannot be similarly dismissed. This litigation has only been pending for two years. The notice protocol ordered by the Court was not completed until December 2013, and the whereabouts of almost all the account holders or their successors are still unknown. [*N*.10] Yet one woman has formally objected to the turnover of her relative's account, *see* Letters from Maria Ana Abarrio Sainz, . . . ., and Computershare has identified two other objectors who did not receive notice of this proceeding. . . . One of the individuals identified by Computershare has now filed an affidavit asserting that she is the rightful owner of $38,000 worth of shares and dividends that Plaintiffs seek to attach. . . .

These competing claims suggest that other potential objectors may not have received notice of this litigation, and raise significant questions about the propriety of enforcing Cuban laws that expropriate privately owned securities located in the United States. **The Fifth Amendment concerns are particularly troublesome in this case because the Computershare accounts are in the names of individuals—not domestic corporate entities that were dissolved or nationalized by the Cuban government. Consequently, the Court concludes that significant Fifth Amendment interests remain implicated, and recognition of Cuban Law Nos. 567 and 568 would violate United States policy against takings without compensation**. (Emphasis ours).

**Because enforcement of the Cuban laws would not further the policy of TRIA and would violate the Fifth Amendment policy against takings without compensation, the expropriation of the**

---

[8] *N*.9: In neither *Chemical Bank* nor *Belmont* did the United States government assert, as it does here, that the foreign expropriation would conflict with national policy. *See Chemical Bank*, 658 F.2d 903; *Belmont*, 301 U.S. 324. In fact, in *Belmont*, the United States was the party seeking the enforcement of the foreign expropriation, because it would advance the policy goal of creating a fund from which American nationals with valid claims against the Soviet government could be compensated. 301 U.S. at 326–27.

**Computershare accounts is not consistent with United States policy and law. Therefore, the Court will not give extraterritorial effect to Cuban Law Nos. 567 and 568 as they pertain to the Computershare accounts. The accounts are not the property of the Republic of Cuba and are not subject to attachment and execution**. As this finding is dispositive, the Court does not reach the remaining issues raised by the parties. (Emphasis ours).

Affirmed by the First Circuit, *Villoldo v. Castro Ruz*, 821F.3d 196.

B.  Cuban Assets Control Regulations, 31 C.F.R. § 515.201 provides in its relevant part:

(a) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if either such transactions are by, or on behalf of, or pursuant to the direction of a foreign country designated under this part, or any national thereof, or such transactions involve property in which a foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States;

(2) All transactions in foreign exchange by any person within the United States; and

(3) The exportation or withdrawal from the United States of gold or silver coin or bullion, currency or securities, or the earmarking of any such property, by any person within the United States.

(b) All of the following transactions are prohibited, except as specifically authorized by the Secretary of the Treasury (or any person, agency, or instrumentality designated by him) by means of regulations, rulings, instructions, licenses, or otherwise, if such transactions involve property in which any foreign country designated under this part, or any national thereof, has at any time on or since the effective date of this section had any interest of any nature whatsoever, direct or indirect:

(1) All dealings in, including, without limitation, transfers, withdrawals, or exportations of, any property or evidences of

indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States; and

(2) All transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States.

(c) Any transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions set forth in paragraph (a) or (b) of this section is hereby prohibited.

(d) **For the purposes of this part, the term foreign country designated under this part and the term designated foreign country mean Cuba and the term effective date and the term effective date of this section mean with respect to Cuba, or any national thereof, 12:01 a.m., e.s.t., July 8, 1963**. (Emphasis ours).

(e) When a transaction results in the blocking of funds at a banking institution pursuant to this section and a party to the transaction believes the funds have been blocked due to mistaken identity, that party may seek to have such funds unblocked pursuant to the administrative procedures set forth in § 501.806 of this chapter.

In the case at bar, the Villoldo brothers insist in the non-applicability of the First Circuit opinion to the facts of the instant case, as plaintiffs are only seeking "discovery, **not turnover at this juncture,** [hence] the First Circuit's decision quoted by the Court has no bearing whatsoever on any issue that is present in this case." (Emphasis ours). *See* Docket No. 52, page 5. "It is not relevant to the dispute and does not support grounds for dismissal of Plaintiffs' claims." *Id.* Plaintiffs further argue:

> Plaintiffs are judgment creditors of Cuba, who are authorized by federal law to execute upon blocked Cuban assets. Under subpoena, the Office of Foreign Asset Control ("OFAC") has provided the Plaintiffs with documents that unequivocally state that Banco Popular is holding assets blocked under the Cuban Assets Control Regulations, 31 C.F.R. part 515. The Plaintiffs's discovery requests are narrowly tailored to the information it needs to determine whether the assets held by Banco Popular are the property of the Cuban Defendants and subject to execution.

18

*See* Docket No. 52, pages 7-8.

It appears from Plaintiff's response to be uncontested that the Villoldo brothers already know that Banco Popular are holding blocked assets under the Cuban Assets Control Regulation, 31 C.F.R. part 515. Consequently, the next step would be to identify the blocked assets and to proceed with the execution of the *Judgment* through a request of turnover of property of the blocked assets. As stated above, this Court cannot authorize a potential request for turn over of blocked assets under the act of state doctrine, which precludes the courts of the United States "from inquiring into the validity of the public acts a recognized sovereign power committed within its own country." *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 393, and *Villoldo v. Castro Ruz*, 821 F.3d at 202-204. "After all, United States law and policy – as evidenced by the Fifth Amendment of the United States Constitution – does not support the taking of private property without just compensation." (Citing *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 51 (2d Cir.1965). 821 F.3d at 202.

If there are assets in Banco Popular under the name of the Castro Ruz brothers, in their personal and/or official capacity; or The Republic of Cuba, or The Ministry of Interior, an agency or instrumentality of The Republic of Cuba; The Army of The Republic of Cuba, an agency or instrumentality of The Republic of Cuba; and The Republic of Cuba, a foreign state, prior to July 6, 1960, these assets are subject to attachment. As to any other assets of The Republic of Cuba which may have been acquired resulting from Cuban Law 851 or any other confiscation of Cuba to Cuban nationals residing in the United States or Puerto Rico, the Court will rely on the Statement of Interest to be presented by the United States, as well as the United States' position regarding national policy interest when determining whether or not the Villoldo's execution of judgment shall proceed against the potential assets, if any, under the custody of Banco Popular.

The Court finds that to allow the attachment and turnover of these assets without the due process would be contrary to the national policy of the United States not to compensate victims of terrorism with assets not owned by the terrorist state, as well as a violation of the Fifth Amendment of the United States Constitution.

## Conclusion

In view of the foregoing, the Court hereby orders:

1.  The United States shall file a statement of interest within the next 20 days. A copy of this *Order* is issued to the United States Attorney for the District of Puerto Rico Rosa Emilia Rodriguez.

2.  The Clerk will notify the United States a copy of this *Order* together with a copy of the docket of this case.

3.  Banco Popular of Puerto Rico shall deliver a sealed list of all the accounts of the Cuban blocked/frozen assets that the bank, after taking in consideration all of the potential assets described in this opinion, has since on or about 1960, by **July 20, 2017 before the end of business**, as directed in sections (a) and (b), *infra*.

    (a)  The most recent annual report provided by Banco Popular de Puerto Rico to the Office of Foreign Assets control of the U.S. Department of the Treasury, regarding assets within its possession that have been blocked/frozen, pursuant to the Cuban Assets Control Regulations, 31 C.F.R. part 515, and all books, papers or records in your possession or control, which may contain information concerning the property or income of, or indebtness due judgment debtor.

All records, documents, and writings of any kind in your possession, custody, or control, relating to all accounts identified in response to Request No. 1, including but not limited to wire transfer information, deposit account information, checking accounts, savings accounts, certificates of deposit, brokerage or trading accounts, and safe deposit boxes.

(b) **Banco Popular's list shall be delivered under seal in a sealed envelope, and shall be HAND DELIVERED to the undersigned at the undersigned's Chambers on July 20, 2017 before the end of business. The information requested shall not be filed with the Court under any fashion, unless the Court otherwise orders**.

4. A hearing will be held by the Court as to the sealed content to be provided by Banco Popular, with Banco Popular's officer who certified and sealed the information requested, on **August 10, 2017 at 2:00 p.m.**, at which time the assets will be known to the moving party. Banco Popular's officer is to explain the nature of each asset as described in the First Circuit Court opinion of *Villoldo v. Castro Ruz*, 821 F.3d at 201-202. The Court as District Judge cannot alter the opinion of the First Circuit, as to the treatments received in the case under the various types of assets described in the case of *Villoldo v. Castro Ruz*, 821 F.3d 196.

IT IS SO ORDERED.

In San Juan, Puerto Rico, this 11th day of July, 2017.

s/Daniel R. Dominguez
DANIEL R. DOMINGUEZ
United States District Judge